Fuld, J.
We granted leave to appeal in this case primarily to consider the question, of state-wide interest and application, whether the State Board of Equalization and Assessment was validly constituted when, in August of 1960, it fixed the equalization rate for a town for the year 1959.
Some 10 or 15 years ago, because of an increase of real estate values with which local assessments had not kept pace, many equalization rates throughout the State were found to be extremely inequitable. To meet this situation, the Legislature in 1949 created a temporary commission, known as the State Board of Equalization and Assessment, to review and revise State equalization rates and to hear and determine appeals of equalization rates fixed by county boards of supervisors and other local authorities (L. 1949, ch. 346). It consisted of 3 members appointed by the Governor: the Comptroller— at that time, the Honorable Frank C. Moore — the Director of the Budget and the President of the State Tax Commission. This body was continued by express statutory enactment until April 1,1960, when the board was reconstituted as a permanent agency (L. 1960, ch. 335; Real Property Tax Law, art. 2, §§ 200-216).
The new legislation or, more particularly, section 200 of the Real Property Tax Law, provided that the State Board was to consist of the Commissioner for Local Government — an office created in 1959 (L. 1959, ch. 335, as amd. by L. 1960, ch. 320) — and 4 other members to be appointed by the Governor for *242 terms of 8 years, by and with the advice and consent of the Senate. Until the new law became effective on April 1, 1960, the temporary board continued to consist of the 3 members occupying the positions referred to above. No appointments were made to the new board until January, 1961, at which time the Governor designated the respondents, the 3 men who had constituted the temporary board. A Commissioner for Local Government has not yet been appointed.
On August 25, 1960, after a hearing, the respondents made a determination reducing the equalization rate for the Town of Smithtown from 43% to 34%. Considering itself aggrieved, the town thereupon brought this proceeding, pursuant to section 760 of the Real Property Tax Law and article 78 of the Civil Practice Act, to annul the determination on two grounds: (1) the permanent State Board was not properly constituted — indeed, that it could not be until the Governor had appointed its full complement of 5, including the Commissioner for Local Government — and, therefore, the action taken by the respondents was without legal authority and void and (2), in any event, the determination made by the board was arbitrary, capricious and unreasonable. The courts below decided against the petitioner on both grounds.
The board is charged with a duty of fixing equalization rates for some 1,600 units of government for 30 vitally important governmental purposes.[1] Surely, as the Appellate Division so well put it, the Legislature could not have intended ‘ ‘ to deprive the public of the benefits of the statutes relating to the equalization of tax assessments in any interval between the termination of the existence of the temporary commission and the bringing of the membership of the permanent board to its full statutory complement.” Nor could the Legislature have contemplated that, no matter how long the Governor took to act in designating all 5 members, equalization rates were to remain as they had been, petrified and frozen into outworn patterns despite constantly rising and changing real estate values in *243 various sections of the State. Yet such would be the result were we to accept the petitioner’s contentions.
It is obvious from the statute creating the permanent board that uppermost in the minds of the legislators was the continuation of the operations of the temporary board without break or interruption. Section 11 of chapter 335 of the Laws of 1960 provides for the transfer of all “ officers and employees ” of the temporary board to the permanent one. And section 14 of the statute, entitled “ Continuity of authority ”, explicitly recites that, “ For the purpose of succession to functions, powers and duties transferred and assigned to and devolved upon the state board of equalization and assessment by this act, such board shall constitute a continuation of the temporary state board of equalization and assessment.”
The Governor did not, it is true, specifically appoint the 3 members of the former board to the permanent one until 1961, nor has he as yet made the additional appointments mandated by the statute, which he will ultimately have to do, since his duty is a continuing one. (See, e.g., Matter of Ottinger v. Voorhis, 241 N. Y. 49.) But the statute did provide for the transfer of officers and employees to the new board and for the continuity of its functions and authority. As for the requirement that there be 5 members rather than 3, it is significant not only that the applicable provision of the Beal Property Tax Law announces that “ a majority ” of the members of the board are authorized to act as a body when establishing equalization rates (Beal Property Tax Law, § 202, subd. 2, as amd. by L. 1960, ch. 335), but that section 41 of the General Construction Law, in defining a quorum as a majority of “ the whole number ”, declares that “ the words ‘ whole number ’ shall be construed to mean the total number which the board, commission, body or other groups of persons or officers would have were there no vacancies ”. We could say, as did the court at Special Term, that the respondents were empowered to act on the theory that the members of the old board served until their successors were appointed. Or we could say, as did the Appellate Division, that the respondents who acted as members of the permanent board under color of right and with the general acquiescence of State and local officials “ were at least de facto officers and their acts *244 were valid.” But, however the thought be phrased, we deem it clear that the 3 respondents were empowered to act as a majority of the permanent board and fix the requisite equalization rates.
If the construction to be accorded a statute is clearly indicated, it is to be adopted by the courts regardless of consequences. Where, however, doubt exists as to its meaning, and a choice between two constructions is afforded, results become important, for, although ‘ ‘ Consequences cannot alter statutes * * * [they] may help to fix their meaning.” (Matter of Rouss, 221 N. Y. 81, 91; see, also, Kauffman & Sons Saddlery Co. v. Miller, 298 N. Y. 38, 44; Matter of Emerson v. Buck, 230 N. Y. 380, 388.) We must, therefore, have in mind the far-reaching and upsetting consequences which would attend reading the legislation before us as the petitioner urges and holding that the State Board was improperly constituted after April 1, 1960 and that all of its subsequent acts are void. Since, as noted above, approximately 1,600 tax districts throughout the State are involved, annulling and setting aside the rates which the respondents fixed after April 1, 1960 would cause a breakdown in the operation both of local tax machinery and of many important local governmental functions. Nothing in the wording of the new statute requires the drastic interpretation of its provisions sought by the petitioner.
Since, then, the board was validly constituted, we proceed to a consideration of the petitioner’s second contention, namely, that the determination made by the board was arbitrary and unreasonable.
Section 1200 of the Real Property Tax Law, entitled ‘ ‘ Studies for establishing state equalization rates ’ ’, directs the State Board, “ as part of its procedure for establishing state equaliza- ■ tion rates ”, to “ sample ”, at least once in every 5 years, “ the ratio of assessments to market values for each major type of taxable real property * * * in all cities, towns and villages.” The 1959 rate, challenged in this proceeding, was based on studies made in 1952 and 1957.
On June 10, 1960, the board notified the petitioner that it had tentatively fixed its equalization rate for 1959 at 34%, a reduction of 9% below the rate previously fixed. The petitioner filed a written complaint, a hearing was held and, after considering the objections voiced and the evidence adduced, the board *245 adhered to the 34% rate. This determination has been sustained by the courts below against the charge of arbitrariness and unreasonableness.[2]
In computing the equalization rate for the petitioner, the board chose 90 samples of property for appraisal, selected at random from among the four types of property chiefly represented in Smithtown and comprising • 85%—the minimum requirement is 80% —of the total assessment roll. The 4 types consisted of 1- and 2-family residences (comprising 61.16% of the assessment roll), residential land vacant (11.62%), estates (5.53%) and commercial, under $50,000 in value (6.88%). The State Board, pursuant to settled procedure, makes no classification of its own of sample properties for appraisal. Its rules require local assessors to indicate on the assessment roll the type of property being assessed for each of the parcels listed, and it then adopts the classifications which have been made by the local assessors. In collecting sales data to verify its appraisals, the board used 45 bona fide sales reported to it by the local assessors for the period from April 1, 1956 through September 30, 1957. The board also ascertained from the local assessors the existence of any circumstances indicating that the transfer was not 'bona fide and the inclusion, if any, of personal property in the sales price.
The town objects to the board’s methods on a number of grounds. In the first place, it points out that its own local assessors had incorrectly classified properties — for instance, labelling residential property as commercial — and that the State Board simply adopted such classifications, thereby compounding the local assessors’ errors, particularly since the total appraised value of the sample parcels in each class was weighted by the percentage which that class bore to the total assessment valuation. Quite apart from the fact that all of these sample properties were appraised by the board’s appraisers at their market values — to cull from the affidavit of the board’s director of equalization—“ in accordance with the conditions and circumstances as the appraisers found them, notwithstanding any error which may have been made by the [local] assessors ” *246 in classifying the properties on the assessment rolls, the simple answer to the petitioner’s complaint is that it has only itself to blame for any erroneous classifications which were made. In point of fact, they did not even attempt to correct the asserted errors when afforded the opportunity. After the appraisers for the board had made their computation, they submitted it to the local authorities to give them an opportunity to object either to values or to the representativeness of the samples selected. At the meeting held for this purpose, the local assessors made no objection on either score. Under these circumstances, it certainly may not be said that the State Board acted arbitrarily, as a matter of law, in using the very classification submitted by the local assessors. If the petitioner wished equalization rates to be established on the basis of the assessed values of its various types of property in accordance with their correct classification, it was up to the petitioner’s local assessors to provide the State Board with the proper information with respect to such classifications. It was not up to that board to verify the classification of, or to reclassify where necessary, incorrectly typed property. If such a duty had to be undertaken in every one of the 62 cities, 932 towns and 550 villages of the State of New York, it would become impracticable, if not impossible, for the State Board to do its job.
The petitioner also attacks the board’s method of “random selection” of samples of property because in one instance it resulted in the choice of seven private homes side by side in the Village of the Branch in Smithtown. The appraisals of these homes were not used in fixing the town’s equalization rate, but only in determining the rate for the village itself, which is not in issue here. Nevertheless, the petitioner contends that this example furnishes irrefutable proof of the impropriety of the board’s random selection method. However, even assuming that such an example affords an instance in which the board’s method worked badly, one such unfortunate example cannot serve to invalidate the entire process.
The petitioner further objects to the hoard’s use of sales data and, although we fail to appreciate its force, urges in its brief that the board “ used forty-five sales of residential property only” and that “ thirty-one of the forty-five sales used were original sales of new development houses,” which the petitioner *247 asserts “ are known to depreciate quickly Moreover, the town claims, the value of personal property was improperly included in some instances as part of the sales price. To all of which the respondents have given a short and decisive answer; they considered all of the bona fide sales available and, even more to the point, all of the pertinent information which they used was obtained from the local assessors themselves. Consequently, they very properly observed, they may not be held accountable or responsible for the few errors which occurred with respect to the inclusion of the value of items of personal property. In addition, where differences between sales price ratios and appraisal ratios were greater than 20%, the board sent questionnaires to purchasers, made recomputations based upon their replies and in some instances, where the results obtained were unsatisfactory, selected different samples for appraisal or used only appraisal values. Although the petitioner is obviously dissatisfied with the results of such appraisals, no basis exists for their argument that the board acted capriciously in making them.
Having in mind the complexities of the task confronting the board, the vast and intricate process of fixing equalization rates, there can be no doubt that the methods employed by the board were more than adequate “ for practical attainment of the rough equality which is all that has heretofore been possible under any system of taxation.” (People ex rel. Hagy v. Lewis, 280 N. Y. 184,188.) Consequently, to state the matter briefly, when the board has acted within its jurisdiction and has given the parties before it a fair hearing, the courts have no alternative but to confirm its determination when substantial evidence is at hand to support it. (See, e.g., Matter of Town of Lewiston v. State Bd. of Equalization & Assessment, 5 N Y 2d 741; Matter of Town of Amherst v. Moore, 11 A D 2d 747, motion for leave-to app. den. 8 N Y 2d 711.) In the case before us, despite the board’s acceptance of certain erroneous classifications and of sales samples which may not have been completely representative in character, both items having been furnished by the local assessors, it may not be said that the reduced rate arrived at—which was considerably less than the average reduction throughout the State — was arbitrary or unreasonable as a matter of law.
*248 Before concluding, we note briefly the petitioner’s further plaint that the board should have considered evidence with regard to the equalization rate of the Town of Huntington. Both Huntington and Smithtown are located in a school district for which both towns share the expense of school taxes. The petitioner -contends that the allegedly erroneous equalization rate of Huntington saddles the taxpayers of Smithtown with an inequitable share of the school taxes for the district in question. However, if the matter requires correction, application should have been made, as the Appellate Division noted, for a special equalization rate provided for school districts in section 1314 of the Beal Property Tax Law.
The order of the Appellate Division should be affirmed, with costs.

. The purposes and functioning of the equalization process have been described in a recent booklet issued by the State Board of Equalization and Assessment. (See Principles and Procedures Used in Establishing State Equalization Rates, Eebruary, 1961.)

. It is worth noting that only one other community, the Town of West Turin, sought to have its equalization rate upset in the courts. (Matter of Town of West Turin v. Moore, 10 Misc 2d 683.)