306 F.3d 87
 CSX TRANSPORTATION, INC., Plaintiff-Appellee,
v.
NEW YORK STATE OFFICE OF REAL PROPERTY SERVICES, Frank B. Cernese, John M. Bacheller, in their official capacities as members of the New York State Board of Real Property Services and their successors in office, Thomas G. Griffin, in his official capacity as executive director and secretary to the State Office of Real Property Services and his successors in office, and Ifigenia T. Brown, Defendants-Appellants,
City of New York, City of Rochester, East Syracuse-Minoa Central School District, North Rockland Central School District, Ravena-Coeymans-Selkirk Central School District, Onondaga County, Monroe County, Town of Bethlehem, Town of Cheektowaga, Town of Stony Point and Village of Herkimer, in their own behalf and as representatives of a defendant's class, Defendants,
The United States of America, Intervenor.
 Docket No. 01-7966.
 United States Court of Appeals, Second Circuit.
 Argued: April 29, 2002.
 Decided: September 25, 2002.
 
 COPYRIGHT MATERIAL OMITTED Gregory G. Fletcher, Baker, Donelson, Bearman & Caldwell, Memphis, TN (James N. Blair, Wolfman, Babbit & King, LLP, New York, NY, on the brief, Courtney G. Hyers, Senior Tax Counsel, CSX Corporation, Richmond, VA, of counsel, David J. Bowling, General Tax Counsel, CSX Corporation, Richmond, VA, of counsel), for Plaintiff-Appellee.
 Daniel J. Chepaitis, Assistant Solicitor General, Office Of the Attorney General of the State of New York, New York, N.Y. (Eliot Spitzer, Attorney General of the State of New York, Caitlin J. Halligan, Solicitor General of the State of New York, Michael S. Belohlavek, Deputy Solicitor General of the State of New York), for Defendants-Appellants.
 Stephanie R. Marcus, Appellate Staff, Civil Division, U.S. Department of Justice, Washington, DC (Robert D, McCallum, Jr., Assistant Attorney General, James B. Comey, Jr., United States Attorney for the Southern District of New York, Mark B. Stern, Appellate Staff, Civil Division, U.S. Department of Justice, on the brief), for intervenor the United States.
 Before MINER and SACK, Circuit Judges, and BERMAN, District Judge.*
 MINER, Circuit Judge.
 
 
 1
 Defendant-appellant the New York State Office of Real Property Services ("ORPS") and defendants-appellants Frank B. Cernese, John M. Bacheller, Thomas G. Griffin, and Ifigenia T. Brown (the "Individual Defendants") appeal from an order of the United States District Court for the Southern District of New York (Brieant, J.) denying their motion, based on Eleventh Amendment immunity, for judgment on the pleadings in a declaratory judgment action brought by plaintiff-appellee CSX Transportation, Inc. ("CSX"). CSX brought the action to enjoin ORPS and the Individual Defendants (collectively, the "State Defendants") from assessing, levying, or collecting ad valorem taxes on CSX's rail transportation property in New York State for the 2001 tax year. CSX alleges in its complaint that the State Defendants' methods for assessing, levying, and collecting taxes on its property violates the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4-R Act" or the "Act"), 49 U.S.C. § 11501. In denying the State Defendants' motion for judgment on the pleadings, the district court concluded that the 4-R Act was "remedial legislation" designed to abrogate Eleventh Amendment immunity of the states pursuant to Congress' powers under the Fourteenth Amendment and that, additionally, jurisdiction over the Individual Defendants could be maintained under the doctrine established in Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).
 
 
 2
 For the reasons that follow, we join the three circuit courts of appeal that have considered this issue, and conclude: (1) that in passing the 4-R Act Congress abrogated the states' Eleventh Amendment immunity pursuant to its Fourteenth Amendment equal protection powers, and (2) that jurisdiction over the Individual Defendants is properly invoked under Ex Parte Young.
 
 BACKGROUND
 I. Proceedings in the District Court
 
 3
 CSX operates an interstate railroad comprised of hundreds of predecessor railroads, the oldest of which dates back more than 170 years. CSX operates in 23 states, including New York, where it conducts its operations on taxable property in 28 of New York's 62 counties. The State Defendants are responsible for establishing annual railroad taxation ceilings for the various taxing districts in New York State.
 
 
 4
 The New York State taxing scheme that is the subject of this appeal has been contested for nearly ten years. On September 20, 1993, the Consolidated Rail Corporation ("Conrail") brought suit in the United States District Court for the Southern District of New York against various defendants including the State Board of Equalization and Assessment of the State of New York (predecessor to ORPS) and some of its employees (collectively the "SBEA"), seeking to enjoin them from imposing state property taxes that were allegedly calculated in violation of the 4-R Act on railroad properties for the 1993 tax year.[1] See Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473 (2d Cir.1995). On January 7, 1994, the district court granted Conrail's motion for a preliminary injunction, finding, inter alia, a likelihood of success on the merits, and certified the defendant class. Id. at 477. The SBEA appealed from the district court's orders, and we affirmed the preliminary injunction and certification on January 31, 1995. Id. at 475. Thereafter, on November 27, 1996, the district court first reached one of the questions presented here: whether the 4-R Act was a valid abrogation of the states' Eleventh Amendment immunity. The district court held that it was. The court concluded that the abrogation of the states' Eleventh Amendment immunity was properly based on the authority conferred by Section 5 of the Fourteenth Amendment.[2] However, that question was never raised on appeal because sometime in 1997 the parties settled Conrail's claims retroactively for tax years 1993 through 1996, and prospectively for the tax years 1997 through 2000.[3]
 
 
 5
 Thereafter, CSX became the successor to a portion of the Conrail railroad property that was the subject of the settlement. See CSX Transp., Inc. v. N.Y. State Office of Real Prop. Servs., 150 F.Supp.2d 605, 608 (S.D.N.Y.2001). Pursuant to statute, the SBEA was succeeded in 1997 by ORPS, which retained the same powers as the SBEA. See N.Y. Real Prop. Tax § 200.
 
 
 6
 On February 13, 2001, CSX filed suit seeking preliminary and final injunctive relief against the State Defendants and a proposed defendant class comprised of all taxing jurisdictions in which CSX operates.[4] In its complaint, CSX alleges that the State Defendants have assessed and plan to assess its properties in New York State at a rate at least 5 percent higher than the ratio of assessed value to true market value of other commercial and industrial property in the districts in which it operates, in violation of the 4-R Act. Accordingly, CSX sought to enjoin the State Defendants and the putative defendant class from assessing or levying taxes against it for the 2001 tax year. The State Defendants filed their answer on March 21, 2001, raising Eleventh Amendment immunity as one of their defenses. The following day, the district court certified the defendant class pursuant to Federal Rule of Civil Procedure 23. On April 30, 2001, the State Defendants moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) on the grounds that the relief sought by CSX was barred by the Eleventh Amendment, and also that Ex Parte Young did not permit suit to be maintained against the Individual Defendants. On May 30, 2001, the district court held oral argument on the State Defendants' motion, at which time CSX sought by order to show cause a temporary restraining order and preliminary injunction to prevent the State Defendants from issuing final certifications of railroad ceilings for the 2001 tax year. That same day, the district court granted a temporary restraining order and scheduled a hearing on the order to show cause application for a preliminary injunction on September 6, 2001.
 
 
 7
 In a Memorandum and Order dated July 10, 2001, the district court denied the State Defendants' motion for judgment on the pleadings. The district court found that the "4-R Act was passed in 1968 in order to address ... well-developed and well-documented concerns that a pattern of discriminatory conduct was evident in the conduct of the States' taxation practices with respect to interstate railroad transportation property." CSX, 150 F.Supp.2d at 611. Accordingly, the district court held that in passing the 4-R Act, Congress had validly abrogated the states' Eleventh Amendment immunity through its enforcement powers under Section 5 of the Fourteenth Amendment. As to the availability of jurisdiction against the Individual Defendants, the district court explained "that the doctrine of Ex Parte Young remains viable" despite "question[ing] by some commentators." Id. at 612. The court also found that jurisdiction could be invoked under Ex Parte Young because the Individual Defendants "are quite demonstrably connected to the unlawful act of State discriminatory taxation of railroad real property." Id. The district court explained that in Hyde Park this Court held that although "as a formal matter" each taxing district in New York makes its own determination of the final assessed value of railroad property, "realistically, when the State Agency determines the railroad ceiling... it is making an `assessment' within the meaning of the 4-R Act." Id. (citing Hyde Park, 47 F.3d at 481). The district court held that such a finding was, "[b]esides its precedential value, ... law of the case." Id.
 
 
 8
 On August 9, 2001, the State Defendants filed a timely appeal, and on September 6, 2001, the district court entered an order continuing the temporary restraining order and adjourning the return date of the preliminary injunction motion until "28 days after entry of the mandate of the United State Circuit Court of Appeals for the Second Circuit ... or such other day and time as the court may direct."[5]
 
 
 9
 II. ORPS and Taxation of Railroad Property in New York
 
 
 10
 ORPS is an executive department of the government of the State of New York charged by statute with the administration of various matters pertaining to real property taxation in New York. See N.Y. Real Prop. Tax § 202. Although local property taxes in New York are imposed by individual assessing units,[6] ORPS is empowered with the "general supervision of the function of assessing throughout the state." Id. § 202(e). ORPS is the successor to the SBEA, which was formed in 1949 as a temporary commission in order to deal with "a legislative concern that the then existing equalization rates had gradually been rendered inaccurate by increases in property values during economic inflation during the aftermath of World War II." State Bd. of Equalization and Assessment v. Kerwick, 52 N.Y.2d 557, 572, 439 N.Y.S.2d 311, 421 N.E.2d 803 (1981). The New York legislature reconstituted the SBEA as a permanent agency in 1960. Town of Smithtown v. Moore, 11 N.Y.2d 238, 241, 228 N.Y.S.2d 657, 183 N.E.2d 66 (1962).
 
 
 11
 Under New York law, railroad property receives a partial tax exemption based on a "railroad ceiling." A railroad ceiling is the maximum value on which a tax district may levy real property taxes on railroad real property; railroad real property is exempt from ad valorem taxation imposed by assessing units to the extent that its assessed value exceeds the railroad ceiling. See N.Y. Real Prop. Tax § 489-p. Among its many duties, ORPS is responsible for determining the ceilings. See id. §§ 200, 202(m). The following procedure is used to determine railroad ceilings for interstate railroad companies. First, ORPS determines the average railway revenue and expenses. Id. §§ 489-ee(1)(a), 489-ff. Using those figures, ORPS determines the ratio of railroad revenues to railroad expenses (the "ratio"). Id. §§ 489-ee(1)(b), 489-gg. The amount of the ratio is then used to determine the "economic factor," which is calculated on the basis of a sliding scale.[7] Id. §§ 489-ee(1)(c), 489-hh. Next, ORPS determines the "local reproduction cost."[8] Id. §§ 489-ee(1)(d), 489-ii. Once those figures have been determined, ORPS multiplies the local reproduction cost by the economic factor. Id. §§ 489-ee(2). The resulting figure is then multiplied by the "state equalization rate," which is "the percentage of full value at which taxable real property in a county, city, town or village is assessed as determined by the state board."[9] Id. § 102(19); see also id. §§ 489-ee(3), 489-jj. The resulting figure is the railroad ceiling for the assessing district.
 
 III. The 4-R Act
 
 12
 Congress passed the 4-R Act in 1976, following some fifteen years of legislative consideration, "to provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system of the United States." Burlington N. R.R. Co. v. Oklahoma Tax Comm'n, 481 U.S. 454, 457, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987) (quoting Pub. L. No. 94-210, 90 Stat. 31). "States were given a 3-year grace period, until February 1979, to bring their property taxation systems into compliance with the statutory requirements" of the Act. Id. at 458, 107 S.Ct. 1855. One of the specific aims of the Act was to combat what Congress determined to be discriminatory over-taxing of the railroads by the states. See H.R. Rep. No. 94-725, p. 78 (1975) (explaining that "railroads are over-taxed by at least $50 million each year"). "When drafting [the Act], Congress was aware that the railroads are easy prey for State and local tax assessors in that they are nonvoting, often nonresident, targets for local taxation, who cannot easily remove themselves from the locality." Dep't of Revenue of Oregon v. ACF Indus., Inc., 510 U.S. 332, 336, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994) (internal quotation marks omitted). Accordingly, Congress prohibited states from engaging in certain acts that "unreasonably burden and discriminate against interstate commerce." 49 U.S.C. § 11501(b).
 
 
 13
 Simply put, the 4-R Act prohibits a state or its subdivision from assessing railroad property at a higher percentage of the property's true market value than the percentage applied to other commercial and industrial property. Id. Under the Act, a state or its subdivision may not:
 
 
 14
 (1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.
 
 
 15
 (2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.
 
 
 16
 (3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.
 
 
 17
 (4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.
 
 
 18
 Id. §§ 11501(b)(1)-(4). The Act provides that the federal courts shall have concurrent subject matter jurisdiction with state courts over any violations of the Act; however, "[r]elief may be granted ... only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction." Id. § 11501(c).
 
 DISCUSSION
 I. Jurisdiction and Standard of Review
 
 19
 We note at the outset that we have jurisdiction over the issues raised on this appeal because an order denying a state's claim of Eleventh Amendment immunity falls under the collateral order doctrine, which allows immediate appellate review in certain circumstances of what would otherwise be a non-final decision. Mancuso v. N.Y. State Thruway Authority, 86 F.3d 289, 291 (2d Cir.1996); see also 28 U.S.C. § 1291. Whether a state is immune from suit under the Eleventh Amendment is a question of law that we review de novo. Cooper, 162 F.3d at 773.
 
 II. Eleventh Amendment Immunity
 
 20
 The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. In addition to its explicit restriction of suits by "Citizens of another State," the Eleventh Amendment has been construed to protect an unconsenting state from suit by its own citizens. See Edelman v. Jordan, 415 U.S. 651, 662-63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The Supreme Court has explained that Eleventh Amendment immunity is an important aspect of our federal system of government in that it assures that each state is a sovereign entity in our federal system and that it is inherent in the nature of sovereignty not to be amenable to suit by any individual litigant without the sovereign's consent. Seminole Tribe v. Florida, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).
 
 
 21
 However, the Supreme Court teaches that Eleventh Amendment immunity is not absolute. First, a state may waive its sovereign immunity and agree to be sued in federal court. See Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). Such a waiver must be "an unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment." Id. Second, Congress may abrogate a state's sovereign immunity if it: (1) "unequivocally expresse[s] its intent to abrogate the immunity," and (2) acts "pursuant to a valid exercise of power." Seminole, 517 U.S. at 55, 116 S.Ct. 1114. CSX does not argue that New York has consented to be sued. CSX does argue that in passing the 4-R Act Congress abrogated New York's immunity from suit.
 
 
 22
 To determine whether a federal statute properly subjects a state to suit in federal court, we first apply a "simple but stringent test: `Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.'" Dellmuth v. Muth, 491 U.S. 223, 228, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989) (quoting Atascadero, 473 U.S. at 242, 105 S.Ct. 3142). This requirement is clearly satisfied here because section 11501 of the 4-R Act explicitly vests jurisdiction not only in the state courts, but also in the "district court[s] of the United States ... to prevent a violation" of the 4-R Act. Accordingly, Congress' intent to abrogate the states' immunity is clear.
 
 
 23
 The parties vehemently contest the answer to our next inquiry: whether the 4-R Act was passed pursuant to a valid exercise of power. The parties' opposing positions on this issue can be traced to the Supreme Court's pronouncements in Seminole. There, the Court held that Congress could not abrogate a state's Eleventh Amendment immunity "[e]ven when the Constitution vests in Congress complete lawmaking authority over a particular area" because "Article I [of the Constitution] cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." 517 U.S. at 72-73, 116 S.Ct. 1114. Seminole made clear that Congress may not abrogate state immunity pursuant to its Commerce Clause powers. See Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 364, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). However, Seminole recognized that the Fourteenth Amendment "operated to alter the pre-existing balance between state and federal power achieved by Article III [of the Constitution] and the Eleventh Amendment," 517 U.S. at 65-66, 116 S.Ct. 1114, and that "§ 5 of the Fourteenth Amendment allow[s] Congress to abrogate the immunity from suit guaranteed by [the Eleventh] Amendment," id. at 59, 116 S.Ct. 1114.
 
 
 24
 Given the Supreme Court's holding in Seminole, it is not surprising that the parties here have starkly opposing positions as to the constitutional authority invoked by Congress in passing the 4-R Act. The State Defendants argue that the 4-R Act "was a classic exercise of [Congress'] Commerce power" and was "not action taken in response to any record of `arbitrary' or `invidious' discrimination by the states against railroads in tax administration, of the kind that would violate the Equal Protection Clause." Thus, the State Defendants argue that subject matter jurisdiction is lacking, since Seminole and its progeny make clear that Congress may not abrogate a state's immunity pursuant to its Commerce Clause powers. CSX argues, as it must, that the 4-R Act was passed pursuant to Congress' duties and powers under Section 5 of the Fourteenth Amendment, and therefore that the Act properly abrogates state immunity. For the reasons that follow, we join the circuits that have considered this issue and conclude that Congress validly passed the 4-R Act pursuant to its authority under Section 5 of the Fourteenth Amendment. See Union Pac. R.R. Co. v. Utah, 198 F.3d 1201 (10th Cir.1999); Wheeling & Lake Erie Ry. Co. v. Pub. Util. Comm'n of Pa., 141 F.3d 88 (3d Cir.1998); Or. Short Line R.R. Co. v. Dep't of Revenue Ore., 139 F.3d 1259 (9th Cir.1998).
 
 
 25
 In Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Supreme Court made clear for the first time that
 
 
 26
 the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment. In that section Congress is expressly granted authority to enforce "by appropriate legislation" the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority. When Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority. We think that Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts.
 
 
 27
 Id. at 456, 96 S.Ct. 2666 (citation omitted). Since Fitzpatrick, the Supreme Court has outlined the type of legislation that falls within the scope of Congress' Section 5 powers. See, e.g., Garrett, 531 U.S. 356, 121 S.Ct. 955; Kimel v. Florida Bd. of Regents, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); Florida Prepaid Post-secondary Ed. Expense Bd. v. College Savings Bank, 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999); City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). The text of Section 5 gives Congress the power to "enforce" the provisions of the Fourteenth Amendment, which include due process and equal protection rights. See id. at 517, 117 S.Ct. 2157. The Supreme Court has made clear that Congress' powers under Section 5 are quite broad: "Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into `legislative spheres of autonomy previously reserved to the States.'" Id. at 518, 117 S.Ct. 2157 (quoting Fitzpatrick, 427 U.S. at 445, 96 S.Ct. 2666). However, the Supreme Court has warned that Congress' enforcement power is "remedial," South Carolina v. Katzenbach, 383 U.S. 301, 326, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), and that "[a]s broad as the congressional enforcement power is, it is not unlimited," Oregon v. Mitchell, 400 U.S. 112, 128, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). Congress "has been given the power `to enforce,' not the power to determine what constitutes a constitutional violation." City of Boerne, 521 U.S. at 519, 117 S.Ct. 2157.
 
 
 28
 Railroads are not a "suspect class" for purposes of Equal Protection analysis. Determining whether Congress properly exercised its powers under Section 5 of the Fourteenth Amendment to enforce the Equal Protection Clause with respect to a non-suspect class requires a two-part test. First, we ask whether Congress identified a history and pattern of unconstitutional discrimination by the states against the non-suspect class. Garrett, 531 U.S. at 368, 121 S.Ct. 955; see also Kimel, 528 U.S. at 88-89, 120 S.Ct. 631. Second, we ask whether the legislation under question passes the "congruence and proportionality" test. City of Boerne, 521 U.S. at 520. We conclude that in passing the 4-R Act Congress both identified a history and pattern of unconstitutional discrimination and fashioned legislation that is a congruent and proportional remedy.
 
 
 29
 First, it is well established in the case law that the legislative history of the Act shows that Congress met its task of identifying a history and pattern of discriminatory taxation against railroads by the states. See Burlington N. R.R. Co. v. Okla. Tax Comm'n, 481 U.S. 454, 457, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987) (After fifteen years of deliberations and investigations, "Congress concluded that `railroads are over-taxed by at least $50 million each year'") (quoting H.R. Rep. No. 94-725, at 78 (1975)); W. Air Lines, Inc. v. Bd. of Equalization, 480 U.S. 123, 131, 107 S.Ct. 1038, 94 L.Ed.2d 112 (1987) ("The legislative history of the antidiscrimination provision in the 4-R Act demonstrates Congress' awareness that interstate carriers `are easy prey for State and local tax assessors' in that they are `nonvoting, often nonresident, targets for local taxation,' who cannot easily remove themselves from the locality.") (quoting S. Rep. No 91-630, at 3 (1969)); Union Pac. R.R. Co., 198 F.3d at 1206 (Section 11501 is "designed to put an end to the widespread practice of treating for tax purposes the property of common and contract carriers on a different basis than other property in the same taxing district.... [D]espite State laws requiring uniform tax treatment, railroads... are discriminated against as compared to other property taxpayers in the same jurisdiction.") (quoting S. Rep. No. 91-630, at 1-2 (1969)) (emphasis deleted).
 
 
 30
 Second, Congress fashioned a congruent and proportional remedy in the 4-R Act. § 11501(c) is narrowly tailored: Only railroads may invoke it; only in order to challenge discriminatory taxation; only when "discrimination passes a threshold of five percent"; and only to seek injunctive relief as to the amount in excess of that allowable under the 4-R Act. Id. at 1208; accord Ore. Short Line R.R., 139 F.3d at 1267; see also Burlington N. & Santa Fe Ry. Co. v. Burton, 270 F.3d 942, 946-47 (10th Cir.2001) (rejecting the proposition that Kimel introduced a new test requiring § 5 legislation not to prohibit "substantially more practices" than necessary, but noting that in any event § 11501(c) would not fail this test).
 
 
 31
 The State Defendants argue that "[g]iven the `large leeway' afforded states in distributing the burdens of taxation, it is only the `palpably arbitrary' or `invidious' tax burden that will fail Equal Protection Clause scrutiny." The State Defendants cite several cases for this proposition, and argue that the wide latitude afforded states with regard to taxing classifications renders the 4-R Act non-remedial. We find this argument to be without merit. Indeed, the states "have broad powers to impose and collect taxes," Allegheny Pittsburgh Coal Co. v. County Comm'n, 488 U.S. 336, 344, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989), and the exercise of such powers will constitute a violation of the Equal Protection Clause "[i]f the selection or classification [of property for tax purposes] is ... capricious []or arbitrary." Brown-Forman Co. v. Kentucky, 217 U.S. 563, 573, 30 S.Ct. 578, 54 L.Ed. 883 (1910).
 
 
 32
 However, whether or not the New York State taxing scheme at issue subjects railroads to a classification that is capricious or arbitrary is not a question to be answered here. The question is whether Congress was acting under its Fourteenth Amendment enforcement power to deter or remedy equal protection violations.
 
 
 33
 In a related argument, the State Defendants contend that the legislative history of the 4-R Act "fails to identify any evidence of Equal Protection Clause violations — never mind a `history and pattern' of such violations — against the railroads by states in the assessment and imposition of taxes." We note at the outset that in determining whether congressional action can be upheld on the basis of Section 5 we are not limited to what Congress "expressly articulated." EEOC v. Wyoming, 460 U.S. 226, 244 n. 18, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983). To be sure, much of the legislative history of the 4-R Act points to Congress' Commerce Clause powers as the triggering authority. And, as discussed above, if the 4-R Act were passed solely pursuant to Congress' Commerce Clause powers it would not be a valid abrogation of the states' Eleventh Amendment immunity. However, the 4-R Act explicitly prohibits certain acts that "unreasonably burden and discriminate against interstate commerce." 49 U.S.C. 11501(b) (emphasis added). More importantly, the discriminatory conduct that the 4-R Act attempts to regulate can be easily associated with Section 5 powers. In short, the legislative history of the 4-R Act, coupled with the clear intent of Congress to alleviate allegedly discriminatory taxing schemes is sufficient to demonstrate that the 4-R Act was passed pursuant to Congress' Section 5 powers.
 
 III. Ex Parte Young
 
 34
 Although we find that the 4-R Act is a valid abrogation of state immunity, we wish to touch briefly upon the issue of whether jurisdiction could independently be maintained against the Individual Defendants. The doctrine of Ex Parte Young is a limited exception to the general principle of sovereign immunity and allows "a suit [for injunctive relief] challenging the constitutionality of a state official's actions in enforcing state law" under the theory that such a suit is not "one against the State," and therefore not barred by the Eleventh Amendment. Ex Parte Young, 209 U.S. at 154, 28 S.Ct. 441. "In determining whether the doctrine of Ex Parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon Md., Inc. v. Public Service Comm'n of Maryland, 535 U.S. 635, 122 S.Ct. 1753, 1760, 152 L.Ed.2d 871 (2002) (internal quotation marks omitted). Additionally, the Supreme Court has instructed that the purpose of Ex Parte Young is to "ensure that the doctrine of sovereign immunity remains meaningful, while also giving recognition to the need to prevent violations of federal law." Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 269, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997).
 
 
 35
 Such a straightforward inquiry here reveals that Ex Parte Young permits jurisdiction over the Individual Defendants for prospective relief because of their role in railroad property assessments and the alleged violation of the 4-R Act. At oral argument and in their brief on appeal, the State Defendants asserted that, because of the New York scheme affording certain powers to local taxing authorities, they are not effectively in charge of the taxation of CSX's property and therefore are not committing a violation of federal law so as to come within the purview of Ex Parte Young. More importantly, the Individual Defendants contended at oral argument that they take no action in instances where the local assessors impose taxes above the ORPS statutorily mandated railroad ceiling. In effect, the Individual Defendants argue that they are not amenable to suit under Ex Parte Young because they are not responsible for the conduct CSX alleges is in violation of federal law. However, a review of the powers of ORPS reveals that it has the authority, among other things, to "monitor the quality of local assessment practices by individual assessing units," remove assessors, impose penalties upon assessors, and order assessors to comply with its directives. N.Y. Real Prop. Tax §§ 202(o), 216. Additionally, we have concluded that only
 
 
 36
 as a formal matter [does] each assessing district make[ ] its own determination of the final assessed value for [railroad] property.... The vast majority of assessing units apparently make no separate, independent valuations of [railroad] property in fixing the local assessed value. Instead, they simply adopt the ceiling calculated by [ORPS]. Realistically, therefore, when [ORPS] determines the railroad ceiling[s] ... it is in practical effect determining ... actual assessments.
 
 
 37
 Hyde Park, 47 F.3d at 481. This precedent establishes that ORPS possesses both the power and the duty under New York law to control assessment of railroad taxes for the local districts.[10] It is those very assessments that CSX argues are in violation of the 4-R Act. Accordingly, Ex Parte Young allows for jurisdiction over the Individual Defendants inasmuch as it is in the performance of their duties that there may be an ongoing violation of federal law. In so holding, we note that such a finding "reflect[s] a proper understanding of [Ex Parte Young's] role in our federal system and respect for state courts instead of a reflexive reliance on an obvious fiction." Coeur d'Alene Tribe, 521 U.S. at 270, 117 S.Ct. 2028.
 
 CONCLUSION
 
 38
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 
 Notes:
 
 
 *
 The Honorable Richard M. Berman, District Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 As discussed in more detail below, the 4-R Act prohibits state and local governments from assessing railroad property for property tax purposes at a ratio of assessed value to true market value more than 5 percent higher than the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdictionSee 49 U.S.C. § 11501.
 
 
 [2]
 The Fourteenth Amendment provides in relevant part:
 Section 1 .... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
 Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.
 
 
 [3]
 Conrail had filed similar suits alleging that the SBEA had violated the 4-R Act for tax years 1994, 1995, and 1996See CSX Transp., Inc. v. N.Y. State Office of Real Prop. Servs., 150 F.Supp.2d 605, 609 (S.D.N.Y. 2001).
 
 
 [4]
 None of the parties representing the defendants' class of taxing jurisdictions participated in this appeal
 
 
 [5]
 At the time of this appeal, final certification of CSX's 2001 railroad ceilings has occurred in only one of the 167 New York taxing districts in which CSX operates. CSX concedes that this occurred because it "permitted its ceiling to go final in one early city, the City of Oswego." In addition, after oral argument of this appeal, the New York State legislature passed a bill affecting assessments of railroad property in a manner favorable to CSX. These changes would not apply to railroad ceiling assessments until January 1, 2003. The legislation awaits the Governor's signature. In any event, it does not affect the tax year at issue in this case
 
 
 [6]
 An assessing unit is defined as:
 (a) a city, town, or county with the power to assess real property, unless the city, town or county is part of a consolidated assessing unit;
 (b) a consolidated assessing unit; or
 (c) a village as provided in section fourteen hundred two of [the New York Real Property Tax Law].
 N.Y. Real Prop. Tax § 102(1).
 
 
 [7]
 The sliding scale economic factor is calculated so that the more profitable railroads receive a higher economic factor. A railroad company with expenses equaling or exceeding revenues receives an economic factor of .20Id. § 489-hh. In contrast, a railroad company with revenues exceeding expenses by 33 percent or more receives an economic factor of 1. Id. It is worth noting that in 1987 the New York State legislature approved an "enhanced railroad ceiling by altering the economic factor so that it provided additional tax relief for railroads." Hyde Park, 47 F.3d at 476. However, this enhanced railroad ceiling expired on March 1, 1993, and was not renewed. Id. The expiration of the enhanced railroad ceiling was the motivating factor behind Conrail's 1993 lawsuit. Id. at 477.
 
 
 [8]
 The local reproduction cost is determined by adding "the cost [in the assessing unit] of reproduction new less depreciation of the railroad real property other than land" and "the value of the land portion of railroad real property and the value of rights in land in, above and under any public street, highway or parkway used by such railroad company [in the assessing unit]."Id. § 489-ii(a)-(b).
 
 
 [9]
 The following procedure is used to determine the state equalization rate:
 [ORPS] selects sample parcels in each assessing jurisdiction, appraises them to determine their respective market values, and then divides those market values by the assessed values for the selected parcels. Those assessed values represent local assessment determinations made by the assessors in each assessing jurisdiction. The results provide the state equalization rate for each assessing district.
 Hyde Park, 47 F.3d at 476.
 
 
 [10]
 The district court appliedHyde Park as precedent and also held that it established "law of the case." CSX, 150 F.Supp.2d at 612. The law of the case doctrine is inapplicable here. See Rezzonico v. H & R Block, Inc., 182 F.3d 144, 148 (2d Cir.1999) (explaining that the doctrine of law of the case "posits that when a court decides upon a rule of law, that decision should [generally] continue to govern the same issues in subsequent stages in the same case." (quoting Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) (emphasis added))).